**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:26-cr-00337-IM** |
| **v.** | **INDICTMENT** |
| **MELISSA FIRESIDE,** | **18 U.S.C. § 1343** |
| **Defendant.** | **Forfeiture Allegation** |

**THE GRAND JURY CHARGES:**

## A. INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1. Defendant MELISSA FIRESIDE was a resident of Oregon, and owner of Resolute Consulting PDX, Limited Liability Company, a company in Portland, Oregon, registered with the Oregon Secretary of State in January of 2018.

2. Defendant FIRESIDE owned and/or controlled an entity called CWE Services, which was not registered with the Oregon Secretary of State.

3. Defendant FIRESIDE was G.F.'s caregiver, handled G.F.'s finances, and prepared G.F.'s taxes.

4. G.F. never owned a business, did not maintain an e-mail address, and did not regularly use a computer.

**The Paycheck Protection Program**

5. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic. One form of assistance provided by the CARES Act was the authorization of up to $349 billion in United States taxpayer funds in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or about April 2020, Congress authorized over $300 billion in United States taxpayer funds in additional PPP funding.

6. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. One certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

7. A business's PPP loan application was received and processed, in the first instance, by a participating financial institution, then transmitted, for further review, to the Small Business Administration ("SBA") to assess the applicant's eligibility. If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies. The SBA guaranteed the loans funded under the PPP and paid lender fees to financial institutions for financing the loans.

8. PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses. Forgiveness of the PPP loan entailed the SBA paying the full loan amount and accrued interest to fully satisfy the lending institution.

9. The PPP also allowed certain eligible borrowers that had previously received a PPP loan to apply for a second PPP loan, with the same general loan terms as their first PPP loan. These "second round" loans could be used for the same purposes as were permitted for the first PPP loans, including payroll costs, interest on mortgages, rent, and utilities.

10. PPP loan applications submitted after January 11, 2021, were transmitted via interstate wires and received through servers located in Oregon.

11. Regardless of date, PPP forgiveness applications were transmitted via interstate wires and received through servers located in Oregon.

///

///

**The Economic Injury Disaster Loan Program**

12. The Economic Injury Disaster Loan Program ("EIDL") was a United States SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

13. The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

14. To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020. The applicant was required to self-certify certain information, including criminal history questions, and was also required to certify all information in the application was true and correct to the best of the applicant's knowledge. EIDL loan applications were submitted directly to the SBA over the Internet, using cloud-based platforms hosted on computer servers in several states. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold. Any funds issued under an EIDL were issued directly by the SBA. EIDL advances of up to $10,000 were also available to small businesses within three days of applying for an EIDL. The amount of any EIDL advance was determined based upon the number of certified employees by the applicant. EIDLs must be repaid, but EIDL advances do not have to be repaid. EIDL loan

proceeds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

15. After July 11, 2020, all EIDL applications were transmitted via interstate wires from state of origination through servers in Iowa.

**Relevant Financial Institutions and Account**

16. U.S. Bank is a federally insured lender headquartered in Minneapolis, Minnesota.

17. Amur Equipment Finance is a commercial business headquartered in Grand Island, Nebraska, that was an approved SBA lender for the PPP.

## B. THE SCHEME TO DEFRAUD

18. Beginning in or about March 2020, and continuing until in or about September 2021, within the District of Oregon, and elsewhere, defendant FIRESIDE knowingly and with intent to defraud, devised, participated in, executed, and attempted to execute a material scheme to defraud the SBA and Amur Equipment Finance as to material matters, and to obtain money and property owned by and in the custody and control of Amur Equipment Finance and the SBA by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

19. The fraudulent scheme operated and was carried out, in substance, as follows:

**EIDL Application**

20. Beginning in or about March 2020, defendant FIRESIDE began submitting EIDL applications to the SBA attempting to obtain funds for several identified businesses. On or about February 11, 2021, defendant FIRESIDE, without authorization, used the identity of G.F. to submit an application in the name of G.F. and "Fireside Construction Services" to the SBA for an EIDL.

21. In the EIDL application, defendant FIRESIDE falsely represented that G.F was the sole owner of Fireside Construction Services; that the business was established on April 30, 2018; that the business had 15 employees; that the business had 2019 gross revenues of $1,795,005; that in 2019 its cost of goods sold was $245,000; and that all the information in the application was true and correct under penalty of perjury.

22. The EIDL application was related to approximately 8 additional EIDL applications defendant FIRESIDE submitted.

23. The EIDL application targeted funding to a U.S. Bank account ending in 7599, in the name of G.F. and controlled by defendant FIRESIDE, that was not associated with a business named Fireside Construction Services.

24. The EIDL attempted to secure funding totaling approximately $150,000 but was declined by the SBA.

**PPP Application**

25. On or about March 5, 2021, defendant FIRESIDE, without authorization, used the identity of G.F. and an e-mail address with G.F.'s first initial and last name to initiate an application in the name of G.F. and "CWE Services" with Amur Equipment Finance for a PPP Loan.

26. On March 19, 2021, defendant FIRESIDE submitted a final PPP loan application (PPP Application) in the name of G.F. and CWE Services, falsely representing that the company was established January 1, 2020, had 15 employees, and an average monthly payroll of $116,318.

27. In the PPP Application, defendant FIRESIDE, using G.F.'s identity, falsely represented that the applicant was eligible for the loan, that the proceeds of the loan would be

used for business-related purposes, that the applicant was in operation on February 15, 2020, and that the proceeds of the loan would be used to retain workers and maintain payroll.

28. In support of the PPP Application, defendant FIRESIDE, using G.F.'s identity, submitted false documentation including a 2020 IRS Form 1040, Schedule C for CWE Services, reporting $1,598,715.79 in gross receipts or sales and $1,395,817.12 in wages paid.

29. In support of the PPP Application, defendant FIRESIDE, using G.F.'s identity, submitted CWE Services' 2020 IRS Form 941, Employer's Quarterly Federal Tax Return from January through March 2020, falsely claiming 15 employees for that quarter and wages, tips, and other compensation reported of $348,954.28, with $145,513.81 in federal income tax withheld and total taxes after adjustments reported of $44,425.39. Defendant FIRESIDE falsely and without authorization digitally signed the Form 941 as G.F. on April 1, 2020.

30. In support of the PPP Application, defendant FIRESIDE, using G.F.'s identity, submitted CWE Services' 2020 IRS Form 940, Employer's Annual Federal Unemployment Tax Return reporting total payments to all employees as $1,395,817.12.

31. In support of the PPP Application, defendant FIRESIDE, without authorization, submitted a copy of G.F.'s Oregon Identity Card and a voided check for the U.S. Bank account ending in 7599 in the name of G.F. and CWE Services, LLC.

32. In support of the PPP Application, defendant FIRESIDE submitted fictitious bank account statements for the U.S. Bank account ending in 7599.

33. Defendant FIRESIDE, using G.F.'s identity, certified that the information provided in the March 19, 2021, PPP Application and all supporting documents and forms was true and correct.

34. In reliance on the false representations and certifications, Amur Equipment Finance and the SBA approved the application and Amur Equipment funded the PPP loan. On April 1, 2021, the SBA wired $290,795 to the U.S. Bank account ending in 7599 in the name of G.F. and controlled by defendant FIRESIDE.

**Use of PPP Loan Proceeds**

35. On April 1, 2021, defendant FIRESIDE wrote three consecutive checks to divert $273,930.38 in PPP proceeds for unauthorized purposes from the U.S. Bank account ending 7599 to accounts owned and controlled solely by her, and/or for her own benefit.

**COUNTS 1-2**
**(Wire Fraud)**
**(18 U.S.C. § 1343)**

36. The allegations in paragraphs 1 through 35 of this Indictment are incorporated as though realleged herein.

37. On or about the dates set forth below, in the District of Oregon, and elsewhere, for purposes of executing the above-described scheme to defraud, defendant FIRESIDE transmitted and caused the transmission of the following items by means of wire and radio communication in interstate and foreign commerce:

| Count | Approximate Date | Interstate Wire Transmission |
|---|---|---|
| 1 | February 11, 2021 | Submission of EIDL application in the name of G.F. and Fireside Construction Services through servers located in the District of Oregon, and elsewhere. |
| 2 | March 19, 2021 | Submission of PPP loan application in the name of G.F. and CWE Services through servers located in the District of Oregon, and elsewhere. |

All in violation of 18 U.S.C. § 1343.

///

///

## FIRST FORFEITURE ALLEGATION

38. Upon conviction of the wire fraud offense alleged in Count 1 of this Indictment hereof, defendant shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including but not limited to a money judgment for a sum of money equal to the amount of property involved in or derived from that offense.

39. If the above-described forfeitable property, as a result of any act or omission of defendant FIRESIDE:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, under 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of defendant FIRESIDE up to the value of the forfeitable property described above.

Dated: September 1, 2026

A TRUE BILL.

[redacted]

OFFICIATING FOREPERSON

Presented by:

SCOTT E. BRADFORD
United States Attorney

GEOFFREY A. BARROW
Assistant United States Attorney